[Cite as *Leight v. Osteosymbionics, L.L.C.*, 2017-Ohio-5749.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No.   105101

**TROY LEIGHT, ET AL.**

PLAINTIFFS-APPELLANTS

vs.

**OSTEOSYMBIONICS, L.L.C., ET AL.**

DEFENDANTS-APPELLEES

**JUDGMENT:**
AFFIRMED AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-14-835958

**BEFORE:**   Boyle, J., McCormack, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:**   July 6, 2017

**ATTORNEYS FOR APPELLANTS**

Michael R. Stavnicky
Jay P. Auwerter
T. Christopher O'Connell
Singerman, Mills, Desberg, & Kauntz Co., L.P.A.
3333 Richmond Road, Suite 370
Beachwood, Ohio   44122


**ATTORNEYS FOR APPELLEES**

**For Osteosymbionics, L.L.C.**

Mark R. Jacobs
Matasar Jacobs, L.L.C.
1111 Superior Avenue, Suite 1355
Cleveland, Ohio   44114

**For James Africa**

James Africa, pro se
64 South Chillicothe Road
Aurora, Ohio   44202

MARY J. BOYLE, J.:

{¶1}    The central question we are called upon to answer is whether, under R.C. 2735.01, a trial court may grant an ex parte emergency motion to appoint a receiver to manage and operate an Ohio limited liability company.[1]

{¶2} In this case, plaintiffs-appellants, Troy Leight and John Nail (collectively "appellants"), appeal from the trial court's judgment granting the emergency motion of defendant-appellee Susan Zull, administrator of the estate of Cynthia Brogan, to appoint a receiver to manage and operate the business of Osteosymbionics, L.L.C. ("Osteo").    On appeal, appellants raise the following assignments of error:

1.    An ex parte receivership is improper.

2.    An ex parte receivership is unconstitutional.

3.    The receivership was invalid because the executrix is not an owner.

4.    [The] estate had no damage.

5.    The trial court has acted inconsistently with this appellate jurisdiction.

6.    [The] bond is inadequate.

{¶3} Because we find that Ohio law permits the granting of an emergency ex parte motion to appoint a receiver and the facts of this case justified the trial court's judgment without providing notice and holding an evidentiary hearing, we affirm and remand to the lower court for further proceedings.

I.    **Procedural History and Facts**

---

[1]    This case came to be heard upon the accelerated calendar pursuant to App.R. 11.1 and Loc.R. 11.1.    According to Loc.R. 11.1(B)(5), "in its discretion, the court may issue a 'judgment entry — accelerated calendar' or a full opinion."

**{¶4}** In October 2006, appellants and Cynthia Brogan entered into an Operating Agreement to form Osteo — an Ohio limited liability company in the business of manufacturing medical devices, primarily cranial implants. Osteo's implants benefit patients in need of brain surgeries.

**{¶5}** In March 2014, "Brogan, acting alone, signed an Amended and Restated Operating Agreement," which amended the Operating Agreement in several ways. *Leight v. Osteosymbionics,* 8th Dist. Cuyahoga No. 102869, 2016-Ohio-110, ¶ 11. Specifically, the Amended and Restated Operating Agreement eliminated "the Board of Managers, making Brogan the sole Manager, vesting the Manager with 'full, exclusive, and complete discretion, power, and authority * * * to manage, control, administer, and operate the business and affairs of the Company,' and giving the Manager irrevocable power of attorney over all members." *Id.* at ¶ 12. In addition, the Amended and Restated Operating Agreement added an arbitration clause. *Id.*

**{¶6}** On November 14, 2014, appellants filed their complaint against Osteo and Brogan for breach of fiduciary duty, fraud, civil conspiracy, freeze out, accounting, and injunctive relief. Appellants alleged that "Brogan mismanaged and improperly exercised control over the L.L.C., including 'attempt[ing] to unilaterally change the operating agreement and governing documents of the Company to benefit herself.'" *Leight* at ¶ 13.

**{¶7}** In response to the complaint, Brogan filed a motion to dismiss the complaint or, in the alternative, to compel arbitration. The trial court denied Brogan's motion, and she appealed to this court. On January 14, 2016, we affirmed the trial court's denial of Brogan's motion to dismiss. *See Leight*.

**{¶8}** Prior to our decision, however, Brogan died on August 31, 2015. At the request of appellants, the trial court substituted Zull as a party for Brogan because Zull had been appointed the administrator of Brogan's estate.

**{¶9}** On June 17, 2016, appellants and Zull, on behalf of Brogan's estate, entered into a settlement agreement that allowed Leight to "operate and have full authority to operate the business" of Osteo for a period of 120 days (the "Standstill Period"). During the Standstill Period, Zull agreed to "cooperate and use best efforts to aid Leight in the transfer of operations of the business, including, without limitation, finances, banking, orders, access, computer access, customer service, production, IP and IT."

**{¶10}** In addition, during the Standstill Period, Leight agreed to provide to Zull, as administrator of Brogan's estate, "monthly reports as to the operations of [Osteo], * * * including sales efforts, orders, revenue, expenses and liabilities of [Osteo]." Leight also agreed to provide "all information reasonably requested from Leight concerning the operations of [Osteo] during the standstill period" and to "make best efforts to operate [Osteo] as a going concern to preserve the value of [Osteo] and its assets."

**{¶11}** Leight further agreed to use his "best efforts during said 120 day standstill to investigate the allegations of the Lawsuit and any misconduct by [Brogan]." According to the settlement agreement, if Leight "[wa]s satisfied at its sole choice, determination and election as to its investigation that there was no misconduct, then Leight shall pay the [sic] Brogan $20,000.00 for all units owned or previously owned by [Brogan] and her Estate and the parties shall then be released in accordance with Section 3, below." If, however, Leight determined "that there was misconduct or improprieties with the business, then Leight shall provide written

notice of that determination to Brogan, no payment shall be made, the Lawsuit shall become active and there shall be no release by or between the parties under this Agreement."

{¶12} The parties also agreed that "[n]othing in this [Settlement] Agreement shall be construed as an agreement by Brogan that Leight is authorized to operate [Osteo] beyond the standstill period or to give greater rights to Leight to operate [Osteo] beyond the standstill period."

{¶13} Effective June 17, 2016, Leight began to operate Osteo during the Standstill Period. According to a memorandum from Zull's attorney, however, Leight failed to deliver Osteo's financial reports until August 9, 2016. Although these financial reports were not made a part of the trial court record, Zull claimed that they showed that Osteo had a balance of $79,111.83 in its checking account as of the end of July 2016.

{¶14} Zull also believed that Leight provided incomplete financial reports for Osteo. Therefore, on August 16, 2016, Zull's attorney emailed Leight's attorney and attached a memorandum with nine initial questions regarding the financial reports. The email stated that "we tried to remain focused on the primary issues. My client does not waive her right to ask for any more information or any other rights she has."

{¶15} Within hours of this email on August 16, 2016, Leight's attorney responded, "We are terminating the settlement and returning the case to active litigation. Additionally, due to the manner the company was run prior to my client's recent involvement, there is a massive negative balance. My client is making a capital call of $150,000. Please let me know who I should be contacting."

{¶16} In response, on September 1, 2016, Zull's attorney sent correspondence to Leight's attorney reminding him that:

[Brogan] is still the majority owner of [Osteo]. As your clients were exercising management of [Osteo] solely under authority granted by the [Settlement] Agreement, your clients are no longer authorized to take any actions on behalf of [Osteo] without my client's approval. Nonetheless, your clients currently have exclusive control over [Osteo's] records, bank accounts, and other assets and they are under a duty to maintain and manage those records and assets for the benefit of the company and its members until such time as control of those records and assets are properly transferred.

In this same letter, Zull requested that the members select "a new person to run" Osteo's business. Although Zull suggested two candidates, he also requested appellants to "propose candidates that they would accept."

{¶17} On September 1, 2016, Zull's attorney wrote another letter to Leight's attorney informing him that Osteo's customer, Longeviti Neuro Solutions (Longeviti), wanted to explore "a merger with or purchase of" Osteo. In the letter, Zull's attorney explained that Longeviti's founder and chief executive officer, Jesse Christopher, had recently told him "that [Jesse Christopher] had previously expressed his interest to Troy Leight, but Mr. Leight declined to discuss the opportunity." Zull's attorney then wrote, "Not only does Mr. Leight lack authority to make such decisions, he never informed my client of Mr. Christopher's interest." Zull requested consent from appellants to move forward with exploring the opportunity with Longeviti.

{¶18} After receiving no response to his letters, on September 8, 2016, Zull's counsel emailed Leight's counsel asking whether to expect a response. On September 9, 2016, Leight's counsel replied that he had "been buried on other matters and in court. I hope to get back to you

next week." On September 14, 2016, Leight's counsel again emailed, "I am following up my guy on your letters." Nothing in the record suggests that Leight substantively responded to Zull's letters or questions about the financial records.

{¶19} Although Leight terminated the Settlement Agreement, he continued to operate and manage Osteo. During this time, Longeviti had a pending order that Osteo needed to deliver by October 6, 2016, for a patient's brain surgery scheduled on October 19, 2016. In support of these facts, Jesse Christopher, the chief executive officer of Longeviti, provided an affidavit that averred:

> Longeviti recently submitted another order for a cranial implant to Osteosymbionics (the "Current Order") for the same price as the Initial Order. The patient to receive that implant is scheduled to have brain surgery on October 19, 2016. That implant must be delivered by October 6, 2016 for that surgery to proceed as scheduled. I know of at least two other patients who are scheduled to have brain surgery and other patients who are waiting to have their brain surgeries scheduled with the expectation that Osteosymbionics' implant will be used in those surgeries. Some of those patients are in pain. Surgeons are developing a new technique that reduces complications for brain surgery patients. That technique depends on the use of Osteosymbionics' implants. If Osteosymbionics does not provide those implants, the scheduled and pending surgeries will be delayed.
>
> On September 26, 2016, Leight informed me that Osteosymbionics does not intend to fill the Current Order.
>
> Based on demand, I expect that Longeviti will be providing at least an average of two orders for cranial implants to Osteosymbionics per week over the next six months if Osteosymbionics continues to fill orders for cranial implants. It is likely that the number of orders submitted by Longeviti will increase above two per week.

{¶20} Christopher's affidavit included emails between Leight and himself about the upcoming October 6 order and future orders. On September 22, 2016, Christopher emailed

Leight, "Our next order's surgery date is 10/6, and we'd like to make an arrangement for 75 more over the next 12 months for a collective expense of around $300,000." The next day, Leight emailed

> Appears that Mark Jacobs is not interested in my offer. Your proposed unit price would not even cover my basic costs such as rent and liability insurance. I have no interest in keeping a company alive to continue to lose money. Bankruptcy is a better financial option.

{¶21} Christopher responded, "We are open to discussion on covering operational costs, please let us know what those may be," and Leight answered, "I entertained your ideas and quite obviously Mark Jacobs has no desire in resolving the issues. Go someplace else." After another email from Christopher trying to maintain the business, Leight replied, "What part of no do you not understand?"

{¶22} Cameron Fordyce, a consultant hired by Leight during the Standstill Period, also provided an affidavit in support of Zull's emergency motion to appoint a receiver that averred:

> Longeviti placed an order for another cranial implant last week for the same price that it paid for its previous cranial implant. I expected that Osteosymbionics would fill that order. Osteosymbionics is capable of filling that order, once Osteosymbionics pays Brian [Greene, a former Osteosymbionics employee] the $500 he is owed for work performed in filling prior orders. The cranial implant that Longeviti ordered must be delivered by October 6, 2016. To deliver that implant on time, Osteosymbionics must begin working on the implant no later than first thing in the morning on October 3, 2016.

> Longeviti was willing to commit to placing 75 orders for cranial implants in the next 12 months generating at least $300,000 in revenue for Osteosymbionics.

> On September 26, 2016, Leight informed Longeviti that Osteosymbionics would

> not fill Longeviti's order.

> When Leight engaged me as a consultant for Osteosymbionics, he agreed that Osteosymbionics would pay me $2,000 per week for my services. Osteosymbionics paid me $4,000 for my first two weeks and has not paid me since. When I asked Leight for Osteosymbionics to pay amounts owed to me and to Brian $500 that was owed to him, so that Brian will be available to

continue filling orders, he told me that Osteosymbionics was bankrupt and that we would have to file a claim with the bankruptcy court.

{¶23} Based upon these facts and evidence, on September 30, 2016, Zull filed her emergency motion to appoint a receiver to manage and operate Osteo.[2] Zull's motion relied upon R.C. 2735.01(A)(1), (A)(6), and (A)(7) and argued that Osteo "[was] in imminent danger of suffering significant harm" because: (1) Leight refused to complete a pending order for a cranial implant that needed to be delivered to Longeviti by October 6, 2016 — six days from the filing of the emergency motion to appoint a receiver — for a patient's brain surgery, (2) Leight's refusal to complete the order could result in the loss of Longeviti as a customer thereby causing Osteo to suffer approximately $300,000 of revenue in the next year, (3) Osteo's failure to complete future cranial implants would prevent other patients from having brain surgeries, (4) Leight's representations that Osteo "[was] bankrupt" necessitated a receiver to preserve its assets from insolvency or bankruptcy, and (5) Leight continued to control Osteo even though he unilaterally terminated the settlement agreement.

{¶24} On the same day Zull filed her emergency motion to appoint a receiver, the trial court granted the motion ex parte. In granting the motion, the trial court held that, "[a]fter considering the pleadings and other documents presented in connection with the matter, as well as arguments presented to the court":

> Zull has met the requirements of Ohio Revised Code Section 2735.01 and the appointment of a Receiver is an appropriate remedy.
>
> Zull has shown by clear and convincing evidence that (a) Osteosymbionics, LLC ("Osteosymbionics") has been and is being financially and operationally mismanaged; (b) Osteosymbionics is in imminent danger of becoming insolvent;

---

[2] Contemporaneous with her emergency motion to appoint a receiver, Zull filed her answer and counterclaim against appellants and Osteo. Zull's counterclaim asserted claims for breach of fiduciary duty, accounting, breach of settlement agreement, declaratory judgment, deferred compensation, and breach of operating agreement.

and (c) the appointment of a Receiver is necessary to preserve the assets of Osteo and protect the interests of the parties during the pendency of this litigation.

The Court is convinced that Osteosymbionics and its assets are in danger and the immediate appointment of a Receiver is necessary and appropriate.

**{¶25}** It is from this judgment that appellants appeal.

## II. Law and Analysis

### A. Standard of Review

**{¶26}** Appellants argue that this court should apply a de novo standard of review with respect to their second assignment of error only. Specifically, appellants claim that the trial court's failure to give notice or hold a hearing prior to granting Zull's emergency motion violated their constitutional due process rights, and therefore, a de novo review should apply. Appellants, however, fail to cite to a single legal authority in support of their position.

**{¶27}** Zull argues that an abuse of discretion standard of review applies in this case. She further states that appellants "provide no support" for the argument that a de novo standard of review applies.

**{¶28}** The trial court is vested with sound discretion to appoint a receiver. *State ex rel. Celebrezze v. Gibbs*, 60 Ohio St.3d 69, 73, 573 N.E.2d 62 (1991). The decision to appoint a receiver will not be disturbed on appeal unless there is an abuse of discretion. *Id.* at ¶ 74; *Cawley JV, L.L.C. v. Wall St. Recycling, L.L.C.*, 8th Dist. Cuyahoga No. 102121, 2015-Ohio-1846, ¶ 7. "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. *In re C.K.*, 2d Dist. Montgomery No. 25728, 2013-Ohio-4513, ¶ 13, citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 482 N.E.2d 1248 (1985).

{¶29} We will apply an abuse of discretion standard of review for each of appellants' assignments of error.

**B.      Appointment of the Receiver Without Notice and a Hearing**

{¶30} Appellants' first and second assignments of error claim that the trial court erred in granting Zull's emergency motion to appoint a receiver because appellants had no notice and the trial court failed to hold an evidentiary hearing.   Specifically, appellants argue that the ex parte appointment of the receiver violates Ohio law and their constitutional right to due process. Because these two assignments of error are interrelated, they will be considered together.

{¶31} The appointment of a receiver necessarily requires dispossessing the owner of his or her property, and therefore, courts have generally required that notice be given before the appointment of a receiver.   This court, however, has held that the general rule requiring notice "is not inflexible" and, thus, a trial court may appoint a receiver without notice if the "facts and situation warrant such an appointment."   *United States Bank, N.A. v. Gotham King Fee Owner, L.L.C.*, 8th Dist. Cuyahoga No. 98618, 2013-Ohio-1983, ¶ 12; *see also Euclid Roxford Co. v. Bolgar*, 8th Dist. Cuyahoga No. 6928, 1926 Ohio Misc. LEXIS 968 (Mar. 1, 1926) (when an emergency exists that requires immediate action, a receiver may be appointed without notice); *Natl. Salt Co. v. United Salt Co.*, 8 Ohio N.P. 325, 11 Ohio Dec. 348, 1901 Ohio Misc. LEXIS 27, syllabus ( 1901) (no notice required if immediate appointment of a receiver is justified and required).

{¶32} Notice may also be dispensed with when it appears that the delay required to give notice of a motion for receiver will result in irreparable harm.   *Mfrs. Life Ins. Co. v. Patterson,* 51 Ohio App.3d 99, 100, 554 N.E.2d 134 (8th Dist.1988).

{¶33} In *Saferin v. Mach Ents.*, 6th Dist. Lucas No. L-85-070, 1985 Ohio App. LEXIS 8842 (Oct. 18, 1985), the plaintiff and the defendants entered into a limited partnership agreement where the defendants managed and controlled the operations of the company. Plaintiff filed a complaint against the defendants and the company alleging that the defendants breached their fiduciary duty and contractual agreement by failing to distribute and allocate net profits, refusing reasonable requests to inspect the company's books, misappropriating and co-mingling business profits with personal funds, wrongfully disposing of partnership property, and violating the terms of the partnership agreement. Along with the complaint, the plaintiff requested the immediate appointment of a receiver. Without the defendants being served or otherwise receiving notice, the trial court appointed a receiver at an ex parte hearing.

{¶34} On appeal, the defendants in *Saferin* argued that the trial court erred when it appointed a receiver without notice to them. The Sixth District found that the complaint with exhibits supported the allegations that the defendants breached their contractual obligations, failed to adequately maintain the property, and fraudulently retained company profits. *Saferin* at ¶ 7. Because the evidence proved that the defendants' conduct caused irreparable damage, the Sixth District held that the trial court did not err when it appointed a receiver in an ex parte hearing. *Id.*

{¶35} In addition, R.C. 2735.01 does not mandate an evidentiary hearing before ruling on a motion to appoint a receiver. In *Cawley,* 8th Dist. Cuyahoga No. 102121, 2015-Ohio-1846, our court held: "[W]here the court is sufficiently convinced that the property is in danger from a review of the affidavits * * * admissions and inferences that can be rationally drawn from these materials and from any arguments presented[,] then a decision appointing a receiver without a hearing is not error." *Id.* at ¶ 8, citing *Victory White Metal Co. v. N.P. Motel Sys., Inc.,* 7th Dist.

Mahoning No. 04MA245, 2005-Ohio-2706; *see also Pal v. Strachan*, 8th Dist. Cuyahoga No. 91808, 2009-Ohio-730 (because the pleadings, affidavit and other materials showed that the business was in danger of being "materially injured," the sua sponte appointment of a receiver without a hearing was proper).

**{¶36}** In this case, the trial court had been involved in the case since November 2014, had held several pretrials, knew the parties, understood the claims and issues, and had ruled on motions, including discovery motions. By the time Zull filed her emergency motion for the appointment of a receiver, the trial court had been involved in the case for almost two years.

**{¶37}** Moreover, appellants' complaint against Brogan centered on a theory that she mismanaged and embezzled money from Osteo and appellants. The parties entered into the Settlement Agreement whereby Leight obtained access over Osteo in order to investigate whether evidence existed to support appellants' claims against Brogan. Once Leight began operating Osteo, he had to provide financial reports during the Standstill Period, but according to the email from Zull's counsel, he failed to do so timely. Then, after being asked questions about the financial reports that he did provide, instead of responding to the questions, Leight, via email, terminated the Settlement Agreement without providing "written notice" of a determination that Brogan committed misconduct with Osteo.

**{¶38}** Even then, Leight continued to control Osteo, but there is no evidence that he reached out to the other members of the company, including Zull on behalf of Brogan, in making decisions. Rather, the affidavits of Christopher and Fordyce proved that Osteo had customers, including Longeviti, that had pending orders that Leight refused to fill. For one order, Osteo had three days to "begin working" on a cranial implant (and six days to deliver it to Longeviti) so

that a patient could have a scheduled brain surgery. Leight's own email told Longeviti to "go someplace else," and "what part of no do you not understand?"

{¶39} In addition, Leight's email to Christopher showed that he believed that "Bankruptcy [was] a better financial option" than to continue to do business with Longeviti. And according to Fordyce's affidavit, Leight told her that Osteo "was bankrupt." Yet, Leight refused to permit Osteo to complete the cranial implant order for Longeviti. Had the order not been timely completed, Osteo could have lost Longeviti's business — which Christopher anticipated the amount to be $300,000 in revenue in the next 12 months. Likewise, the affidavit of Christopher proved that other patients expected Osteo's cranial implants for future brain surgeries. These facts support that Leight's actions posed an immediate and significant threat of imminent danger to Osteo and its assets, including its financial viability.

{¶40} Appellants rely on *Ry. Co. v. Jewett,* 37 Ohio St. 649, 1882 Ohio LEXIS 229 (1882), for the argument that the trial court erred in granting the motion to appoint a receiver without notice to them. After a review of *Jewett*, we do not find that the Ohio Supreme Court forbids a granting of a motion for a receiver without notice. In *Jewett*, the Ohio Supreme Court found that the trial court had no obstacle to provide notice to the defendant before acting on the appointment of a receiver because the allegations in the case did not include fraud, insolvency, or danger of harm to the company property. *Id.* at 659. The *Jewett* court held, however, that a motion for appointment of a receiver can be lawfully made without notice if the delay required to give such notice will result in irreparable loss. *Id.*

{¶41} The facts of this case are distinguishable from *Jewett*. Here, the affidavits of Christopher and Fordyce, along with the emails between Christopher and Leight proved that imminent danger to Osteo would have occurred had the trial court not immediately appointed a

receiver because the Longeviti order would not have been filled; the patient would not have had the scheduled brain surgery; other patients would not have received their cranial implants; and Longeviti would likely have stopped doing business with Osteo, thereby preventing Osteo from receiving revenues of approximately $300,000 over the next 12 months. Therefore, had the trial court delayed the granting of the emergency motion in order to provide notice to appellants and a hearing, Osteo would have suffered irreparable harm.

{¶42} Accordingly, we find that the trial court did not abuse its discretion in granting Zull's emergency motion for the appointment of a receiver without notice or a hearing.

{¶43} Appellants' first and second assignments of error are overruled.

## C. Standing

{¶44} Appellants' third assignment of error argues that the trial court erred when it granted the emergency motion to appoint a receiver because Zull, as administrator of Brogan's estate, "is not an owner of" Osteo. Relying on R.C. 1705.15 and the 2006 Osteo Operating Agreement, appellants claim that because Brogan died in August 2015, so too did her membership interest in Osteo. Thus, according to appellants, Zull has no "right to or interest in" Osteo property and, therefore, Zull did not have standing to obtain a receiver under R.C. 2735.01.

{¶45} In response, Zull claims that the language contained in R.C. 2735.01(A)(1), (A)(6) and (A)(7) does not require her to have an ownership interest in Osteo to have standing to obtain the appointment of a receiver. Regardless, Zull asserts she has an interest in Osteo as the administrator of Brogan's estate, and therefore, she properly obtained the appointment of the receiver.

**{¶46}** R.C. 2735.01(A)(1) provides that the appointment of a receiver is proper "between * * * others * * * interested in any property or fund, on the application * * * of a party whose right to or interest in the property or fund, or the proceeds of the property or fund, is probable, and when it is shown that the property or fund is in danger of being lost, removed, or materially injured."

**{¶47}** Applying the plain language of the statute, we find that Zull had standing to seek the appointment of the receiver. The trial court substituted Zull for Brogan after Brogan died. As the administrator of Brogan's estate, Zull had the obligation to protect Brogan's assets, including her interest in Osteo. Thus, Zull had a "probable" "right to or interest" in the Osteo property in order to protect Brogan's estate's interests and claims to Osteo and its assets.

**{¶48}** Because we find that Zull had standing to seek the appointment of a receiver for Osteo under R.C. 2735.01(A)(1), we need not render an opinion as to the extent of Zull's rights and interest in Osteo because those will be determined at the trial of the underlying matter. Appellants' third assignment of error is overruled.

### D. Damages

**{¶49}** Appellants' fourth assignment of error claims that the trial court erred in appointing the receiver because Zull failed to allege or show any probable damage because "none had occurred or could occur." Because Brogan died on August 31, 2015, according to appellants, the amount owed by or to Brogan "could not increase or decrease based upon anything [Osteo] does now."

**{¶50}** In response, Zull argues that the basis for the appointment of a receiver is to "prevent the damage caused by the loss of property and to preserve the property so that interested parties may recover on their underlying rights and claims." Zull claims that it is the damage

caused by loss to Osteo that is addressed by the appointment of a receiver, not the damages sought in the underlying claims in the action.

{¶51} We agree with Zull. R.C. 2735.01(A)(1) states that the appointment of a receiver is proper when "it is shown that the property or fund is in danger of being lost, removed, or materially injured." Likewise, R.C. 2735.01(A)(6) states that a receiver may be appointed if the limited liability company "is insolvent, [or] is in imminent danger of insolvency." Thus, the issue is not whether Zull proved damages. The issue is whether the evidence proved that Osteo's assets "were in danger of being lost, removed, or materially injured" or whether Osteo "is insolvent [or] is in imminent danger of insolvency."

{¶52} We have determined that the trial court properly granted the emergency motion to appoint a receiver because of the imminent danger to Osteo, its assets, and its financial viability. Therefore, the trial court did not abuse its discretion in granting Zull's emergency motion for the appointment of a receiver.

{¶53} Appellants' fourth assignment of error is overruled.

**E.      The Trial Court's Conduct After Granting Zull's Emergency Motion**

{¶54} Appellants' fifth assignment of error argues that the trial court has acted inconsistently with appellate jurisdiction. Specifically, appellants claim that the trial court "has been taking actions post appeal" despite the fact that all actions should be stayed because the trial court is divested of jurisdiction.

{¶55} This assignment of error is unrelated to the trial court's judgment granting Zull's emergency motion for the appointment of a receiver, which is the only issue on appeal. Rather, this assignment of error seeks review of actions by the trial court after the September 30, 2016 judgment granting Zull's motion. It is well established that this court need not address an

assignment of error pertaining to issues outside the scope of an appeal. *State v. Briscoe*, 8th Dist. Cuyahoga No. 98414, 2012-Ohio-4943, ¶ 9, citing *State v. Pollard*, 8th Dist. Cuyahoga No. 97468, 2012-Ohio-2311. This court does not allow such impermissible bootstrapping. *Id.*

**{¶56}** Even if we consider appellants' fifth assignment of error, we would not find that the trial court's actions "post appeal" are improper. "Even if an appeal is pending, the trial court retains jurisdiction to take action in aid of the appeal and 'over issues not inconsistent with the appellate court's jurisdiction to reverse, modify, or affirm the judgment appealed from.'" *Schmitt v. Ward*, 9th Dist. Summit No. 28324, 2017-Ohio-4171, ¶ 8, quoting *In re S.J.*, 106 Ohio St.3d 11, 2005-Ohio-3215, 829 N.E.2d 1207. Thus, the timely filing of a notice of appeal only precludes a trial court from issuing orders affecting matters at issue in the appeal. *State ex rel. Electronic Classroom of Tomorrow v. Cuyahoga Cty. Court of Common Pleas*, 129 Ohio St.3d 30, 2011-Ohio-626, 950 N.E.2d 149, ¶ 14.

**{¶57}** Appellants' fifth assignment of error is overruled.

**F.      Bond**

**{¶58}** Appellants' sixth assignment of error claims that the trial court erred when it required only a $1,000 bond to be posted for the appointment of the receiver. Appellants argue that the nominal bond is inconsistent with Zull's arguments and the injuries suffered by the appellants because the bond does not accurately reflect the value of the assets or property the receiver may possess.

**{¶59}** R.C. 2735.03 allows a trial court to direct the amount of a receiver's bond; thus, "the amount of the bond is within the discretion of the trial court[.]" *Am. Ent. Bank v. Garfield Hts. Prop., L.L.C.*, 8th Dist. Cuyahoga No. 98646, 2013-Ohio-2526, ¶ 29. In *Am. Ent. Bank*, this court found a $1,000 receiver bond to be proper even though the property in the case had a

market value of greater than $1.1 million. *Id.* at ¶ 30, 32. In addition, in *Fifth Third Bank v. Q.W.V. Properties, L.L.C.*, 12th Dist. Butler No. CA2010-09-245, 2011-Ohio-4341, ¶ 31, the trial court did not abuse its discretion by setting a receiver's bond at $0 even though the property was valued in excess of $1 million.

**{¶60}** Here, using its discretion, the trial court set the receiver's bond at $1,000. Appellants have provided no evidence to indicate that the bond amount is inadequate. Rather, appellants simply assert that Zull has "claimed that the estate's interest in the company has some great value to them. If that is true, then there is great value and the receiver should be required to post a commensurate bond that reflects that high value." From the evidence submitted to the trial court, however, appellants themselves believed Osteo to be financially unsound because Leight made representations that Osteo "was bankrupt."

**{¶61}** Based on these facts, we decline to find that the trial court abused its discretion with respect to the amount of the receiver's bond. Appellants' sixth assignment of error is overruled.

**III.    Conclusion**

**{¶62}** We find that an abuse of discretion standard of review applies when we review a judgment granting an emergency ex parte motion to appoint a receiver. We also hold that the trial court did not abuse its discretion when it granted Zull's emergency ex parte motion for the appointment of a receiver. We further find that Zull had standing to seek the appointment of a receiver for Osteo under R.C. 2735.01(A)(1). We also determined that Zull did not have to prove damages in order to obtain the appointment of a receiver; rather, she had to prove, and did prove, that Osteo's assets "were in danger of being lost, removed, or materially injured" or that

Osteo "is insolvent [or] is in imminent danger of insolvency." Finally, we hold that the trial court did not abuse its discretion when it required a $1,000 receiver's bond.

{¶63} Judgment affirmed and case is remanded for further proceedings consistent with this opinion.

It is ordered that appellees recover from appellants the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

MARY J. BOYLE, JUDGE

TIM McCORMACK, P.J., and
SEAN C. GALLAGHER, J., CONCUR